STATE OF MAINE                              SUPERIOR COURT
KNOX, ss.                    AUG 9 2002      CIVIL ACTION NO.
                                            CV-00-015
                                            KNO-

NATHAN PEASE, THOMAS            )
WORCESTER, ALAN S.             )
JOHNSON, and THOMAS            )
WORCESTER,                     )
            Plaintiffs         )
                               )            **DECISION AND ORDER**
                               )
v.                             )
                               )
JASPER WYMAN & SON,            )
ALLEN'S BLUEBERRY             )            **DONALD L. GARBRECHT**
FREEZER, INC., CHERRYFIELD     )            **LAW LIBRARY**
FOODS, INC., and MERRILL      )
BLUEBERRY FARMS, INC.,         )            **AUG 14 2002**
            Defendants         )

DONALD L. GARBRECHT
LAW LIBRARY

AUG 14 2002

The matter is before the court on the defendants' motions for summary judgment, and the plaintiffs' motion for reconsideration for class certification. For the following reasons, the motion for reconsideration for class certification is allowed and the motions for summary judgment are denied.

## BACKGROUND

### 1. Characteristics of the Wild Blueberry Industry in Maine

Blueberries are native to North America, and the great majority of the world's blueberry supply comes from this continent. The blueberry industry has two components: wild ("low bush") blueberries and cultivated ("high bush") blueberries. The plaintiffs are four Maine wild blueberry farmers who sell their berries to the defendants, who then process the berries for commercial sale.

Wild blueberries are harvested from "low bush" blueberry plants[1] which grow wild only in a relatively small geographic area consisting of portions of Maine, other areas in northern New England, and eastern Canada. The rocky soil, uneven topography, and

---

[1] The "low bush" plant is different from the "high bush" blueberry plant, which is used to farm and raise cultivated blueberries. "Low bush" blueberry plants hug the ground, follow the topography of the particular field in which the plant is found, and produce fruit biennially, while "high bush" blueberry plants grow vertically, are planted in rows like other farm-raised products, and produce fruit annually.
Moreover, wild blueberries are smaller in size, deeper in color, and much stronger and sweeter in taste than cultivated blueberries.

two-year growing cycle[2] are factors which, according to the defendants, impede the commercial production of the wild blueberry plant. The wild blueberry itself is fragile, with the volume and quality of the fruit deteriorating as soon as it is picked from the bush, if not sooner. For that reason, a very small portion of Maine's blueberry crop is sold in the fresh market. Fresh market sales of wild blueberries are mostly unorganized and involve sales to individuals and local food retailers, and sales from roadside stands.[3]

Approximately 55-65% of Maine wild blueberries go to processors for commercial use. Fresh wild blueberries must be processed shortly after being picked, and because of their highly perishable nature, they cannot be transported long distances. Thus, the relevant geographic market for Maine wild blueberries is limited to production in Maine and, at the most, parts of eastern Canada.

The fragility of the Maine blueberry also makes it susceptible to degradation from its environment,[4] and the actual handling and storage from the time it is picked until it

---

[2] The growing cycle of the "low bush" blueberry plant spans two-years. It typically grows in the following pattern:

- The plant is picked of the fruit of the first harvest;
- The plant is pruned to the ground, leaving only the root system (the primary method of pruning is to burn the entire blueberry field, although some recent innovations allow some plants to be mowed if the topography of the field permits);
- Over the ensuing two years of the growing cycle, the land is managed primarily with fertilizers, herbicides, and weed removal;
- When shoots of the plant reappear, the plant is monitored for disease or pest infestation;
- During the spring of the second year, beehives are placed throughout the field in order to facilitate pollination of the blueberry plant, which is necessary if the plant is to bear fruit;
- After pollination occurs, the plants and fruit are managed for problems such as dehydration, weed control, pest infestation, and disease;
- The wild blueberry typically matures to ripeness sometime during late July or August of the second year.

[3] The lack of an important fresh market outlet for Maine wild blueberries is, allegedly, an important factor that distinguishes Maine's wild blueberry production from the production of cultivated blueberries in other states. The percentage of cultivated blueberry production allocated to the fresh market has been stable over time, with approximately 45% of the cultivated blueberry crop going to the fresh market. The fact that cultivated blueberries have a fresh market outlet, according to the defendants, is a key factor in explaining why the price paid to growers of cultivated blueberries for processing uses often exceeds the grower price paid for fresh wild blueberries.

[4] According to the defendants, the Maine wild blueberry is particularly vulnerable to environmental factors (*e.g.*, rain/drought, heat/frost, hail, wind, foraging animals, etc.) during the final stages of the biennial growing cycle. These environmental factors can greatly reduce the volume and quality of the berry, if not destroy the fruit entirely, even if whoever managed the field and the plant correctly called all of the decisions made up to that point in the growing cycle. The risks and uncertainties associated with such

reaches the processor, who may use any of the following methods to prepare the fruit for commercial use: the "individually quick frozen" (the "IQF") process (a process by which the blueberries are frozen for commercial use), drying, pureeing, grinding, or crushing.[5] According to the defendants, the cost of processing fresh wild blueberries is more than the cost of processing fresh cultivated blueberries because of the wild blueberry's high perishability.

According to the defendants, companies which process Maine wild blueberries exist in a highly competitive market. There are more than 500 wild blueberry growers in Maine, and excluding foreign companies, there are approximately ten processors or other purchasers of fresh wild blueberries in Maine. The plaintiffs assert, however, that the four named defendants process approximately 85% of all wild blueberries grown in Maine.[6]

The defendants pay a "field price" for the blueberries. The field price is the amount paid for unprocessed blueberries delivered to processors or their agents in the field. According to the plaintiffs, the field price is the principal, and in most cases the sole, component of the price the defendants pay to growers for their wild blueberries. See Supplemental Report of Dr. Solow, p. 3. Between 1996 and 1999, the field price ranged between $.40 and $.55 per pound.[7]

---

environmental factors vary from growing area to growing area, as well as with the topography and solar orientation of each field.

[5] Each defendant uses the IQF process.

[6] This percentage can be broken down in the following manner:

> Cherryfield and Wyman's share approximately 60-65% of the market
> Allen's has approximately 10% of the market
> Merrill has approximately 10% of the market

[7] The following is Dr. Solow's breakdown of field prices paid by each defendant to growers, and the percentage of transactions at the specified field price.

| Year | Allen's | Cherryfield | Wyman's | Merrill's |
|------|---------|-------------|---------|-----------|
| 1996 | $.55 (90%) | $.55 (97%) | $.55 (97%) | $.55 (93%) |
| 1997 | $.40 (84%) | $.43 (80%) | $.43 (97%) | $.40 (96%) |
| 1998 | $.45 (88%) | $.45 (82%) | $.45 (97%) | $.40 (85%) |
| 1999 | $.50 (87%) | $.50 (84%) | $.50 (98%) | N/A |

Supplemental Report of Dr. Solow, Table 1.

The plaintiffs allege that the defendants do not reveal the field price until after the processors have received the growers' blueberries, and that at the time of delivery growers do not know what price they will receive for the blueberries. The plaintiffs further allege that the defendants wait to set the price they will pay the growers until after the defendants have already entered into contracts to resell most of the blueberries.[8] In October or later, approximately two months or more after they have received the growers' blueberries, the defendants reveal the field price, *i.e.*, the price they will pay for a pound of blueberries loaded on a truck in the field. The plaintiffs allege that the defendants set the field price without negotiating with the growers, and that they set the field price by agreement among themselves.

The defendants have paid some growers a premium in addition to the field price. Solow Supp. Report, p. 7. Dr. Solow explains:

> An analysis of these premiums indicates that they are basically a volume bonus; that is, primarily larger sellers such as cooperatives get the premiums, and the size of the premium per pound increases as the grower's volume increases. Because these premiums appear to be based on volume and because they constitute a relatively small portion of the overall payment to the growers, it appears the same bonuses would have been paid with or without the alleged conspiracy. Hence, the

---

The following is Dr. Sexton's breakdown of *the volume-weighted average* field prices paid by three of the defendants to growers between 1996 and 1999.

| Year | Allen's | Cherryfield | Wyman's |
|------|---------|-------------|---------|
| 1996 | .560 | .516 | .569 |
| 1997 | .420 | .435 | .482 |
| 1998 | .462 | .459 | .535 |
| 1999 | .514 | .507 | .594 |

Sexton Report, Table 6.

[8] The following is Dr. Solow's chart showing the median price received by wild and cultivated blueberry *processors* per pound between 1996 and 1999:

| Year | Wild Blueberry price/pound | Cultivated Blueberry price/pound |
|------|----------------------------|----------------------------------|
| 1996 | 1.13 | 1.08 |
| 1997 | .97 | .90 |
| 1998 | 1.11 | .81 |
| 1999 | 1.15 | .88 |

4

alleged unlawful depression of the field price, which impacted every grower whether or not it also received a bonus, would have caused all growers to receive less for their blueberries than they would have received absent the alleged anti-competitive conduct.

Id.

## 2. The Experts

Both the plaintiffs and defendants have submitted the opinions of experts, Dr. Solow and Dr. Sexton, respectively. Both Dr. Sexton and Dr. Solow describe the processing sector of the Maine wild blueberry industry as a loose oligopsony.[9] Apart from that, the two experts disagree substantially over whether the defendants are engaging in anticompetitive behavior.

### a. Dr. Solow

Dr. Solow concludes "(a) that the wild blueberry industry appears to be operating in a fashion consistent with the plaintiffs' price-fixing and market allocation allegations; [and] (b) that the alleged conspiracy would have impacted all members of the class, in that it would have caused all blueberry growers to receive less for their blueberries from the defendant processors than they would have received absent the alleged conspiracy . . .

---

[9] An oligopsony is "[a] market condition in which purchasers are so few that the actions of any one of them can affect price and hence the costs that competitors must pay." WEBSTER'S III NEW RIVERSIDE UNIVERSITY DICTIONARY 819 (1988). As Dr. Solow explains:

> [an] oligopsony differs from pure monopsony in that no single firm can determine the market price because each is faced with one or more rivals capable of having a significant effect on total purchases. [Further, i]t differs from competition in that each of the oligopsonists recognizes that its price and purchasing choices will affect the profitability of its rivals' decisions, and will engender responses from those rivals that must be taken into account when evaluating the profitability of alternative strategies, including pricing and purchases. Agreements among oligopsonists to coordinate their pricing, purchasing or other strategies, or to refrain from competing for suppliers' business, can allow them to approximate the monopsony outcome in the market. With such agreements, oligopsony also leads to an inefficient allocation of resources and a wealth transfer from producers to buyers in the same way that monopsony does.

Supplemental Report of Dr. Solow, p. 5.
"[An] oligopsony can lead to collusion among the few buyers in a market, with results similar to those produced by [a] monopsony." Roger D. Blair and Jeffrey L. Harrison, *Antitrust Policy & Monopsony*, 76 Cornell L. Rev. 297, 308 (1991). "[C]ollusive monopsony [(oligopsony)] has the same deleterious effects on social welfare as does pure monopsony: too few resources will be employed. Abused suppliers are hurt by a collusive restraint that reduces the price their output commands. Moreover, since the suppliers provide less of their product, the quantity produced of the final good must also decline." Id.

." Supplemental Report of John Solow, pp. 2-3 ("Solow Supp. Rep."). Solow supports his conclusions with the following.

### i. Failure to Solicit Growers

First, while the defendants "generally indicate a desire to expand their businesses," they admit that they do not solicit each others' growers. For example, "[o]n at least one occasion, a grower's switching from Allen's to Cherryfield led an executive from Allen's to angrily question an executive of Cherryfield as to whether the latter was soliciting growers. Cherryfield's executive, however, reassured the executive of Allen's that his company does not actively go after growers." Id. at 8. Also, "[i]n at least one year, following a poor crop in Canada due to frost, a Canadian buyer approached Maine growers offering a higher price for their blueberries, but the American processors did not raise their prices in response." Id. "In fact, the evidence indicates that very few growers change processors from year to year, a fact that the processors readily admit." Solow concludes that these examples are an indication that the field price is not determined "by the processors bidding against each other for the crops of the growers." Id. at 8.

> Although representatives of the defendant processors have indicated that they have to match any higher price offered to growers by another processor, these are meaningless statements because no Maine processor attempts to hire growers away from other processors by offering a higher price. In fact, the smaller defendant processors . . . have on occasion paid a slightly lower field price than the larger defendant processors . . . with no apparent effect on their purchases.

Id. at 8-9.

### ii. Similarity in Field Prices

Second, "[t]he defendants' respective field prices have had a high degree of similarity." Id. at 6. See n. 10. "[E]ven though the evidence is limited, it appears that the field price is determined by price leadership, in which field prices are announced by Cherryfield and then closely matched by the other processors." Id. at 9.

Representatives of Wyman and Merrill admitted that they are not the first to announce. See id. at 9. Further, "Allen and Merrill jointly own Coastal Blueberries, a company that purchases wild blueberries on behalf of those two processors at a price set by Allen. Thus, Allen implicitly sets the price paid for some of the blueberries received by Merrill, and there is a channel of communication on price between Allen and Merrill."

6

Id. at 9. "On the other hand, Mr. John L. Bragg, who sets the field price for Cherryfield, states that at the time he sets the field price he does not know what the other processors are paying." Id.

### iii. Comparison with the Cultivated Blueberry Market

Third, Solow finds that "[a] reasonable point of comparison is the price that cultivated blueberry growers receive for their blueberries." Id.

> In a competitive market, one would expect the wild blueberry growers to receive at least as much for their fruit as cultivated growers. This conclusion is based on several reasons. First, wild and cultivated blueberries are substitutes, and the wild and cultivated blueberry segments of the industry view each other as such. The more the market views two products as substitutes, the closer they should be in price. As substitutes to at least some degree, wild and cultivated blueberries should be similarly priced.
>
> Second, while wild and cultivated blueberries are substitutes, they are not perfect substitutes. There are differences between the two products; in particular, wild blueberries have quality advantage over cultivated blueberries. Wild blueberries have a deeper color and are claimed to be sweeter and more flavorful and to hold their shape better in some uses. In a competitive market those differences would result in a *higher* price for wild blueberries compared to cultivated blueberries.

Id. at 9-10 (emphasis original).

"If the market for *unprocessed* wild blueberries were competitive, economic theory predicts a similar pricing disparity between wild and cultivated blueberries as exists in the market for processed blueberries, all else equal. That is, one would expect unprocessed wild blueberries to enjoy a similar price premium over unprocessed cultivated blueberries. Economic theory tells us that if the market for unprocessed blueberries were competitive, the growers of the higher quality wild blueberries would receive a higher price for their crops than the growers of the lower quality cultivated blueberries."[10] Id. at 10-11.

---

[10] Solow provides a chart of the prices paid to growers of wild and cultivated blueberries by processors between 1996 and 1999:

| Year | Wild | Cultivated |
|------|------|------------|
| 1996 | .57  | .76        |
| 1997 | .43  | .64        |
| 1998 | .46  | .48        |

Dr. Solow opines that the "[p]ossible alternative explanations of these facts . . . are not consistent with the facts of the industry." Id. at 11. First, "[i]f competition determined the prices of processed and unprocessed blueberries, those prices would be determined by the forces of supply and demand. Generally, higher demand and lower supply lead to higher prices, and lower demand and higher supply lead to lower prices." Id., at p. 11.

Second, the defendants' argument that the reason wild blueberries generally get less money is that it costs more to process wild blueberries than it is to process cultivated blueberries is false. Dr. Solow explains:

> A comparison of the available data on the non-purchasing costs of processed wild and cultivated blueberries indicates that non-purchasing costs of processed blueberries are higher for wild blueberries. Table 5[11] compares the costs of processed blueberries, excluding the cost of acquiring the blueberries themselves, for three of the defendants and a processor of cultivated blueberries (Sakuma Brothers Processing, Inc.). That analysis shows the non-purchasing costs of processed wild blueberries to be no higher than, and in fact somewhat lower than, the non-purchasing cost of processed cultivated blueberries.

Id., at p. 12.

1999      .50      .66

| [11] Company | 1998 ($/lb.) | 1999 ($/lb.) |
|---|---|---|
| Defendants | | |
| Merrill Blueberry Farms | $.16 | $.29 |
| Cherryfield Foods, Inc. | $.26 | $.28 |
| Jasper Wyman & Sons | $.26 | ---- |
| Average | $.21 | $.28 |
| Cultivated Processor | | |
| Sakuma Brothers Processing, Inc. | $.38 | $.29 |

Solow Supp. Rep., Table 5.

Incidentally, Dr. Sexton challenges the appropriateness of comparing the defendants to Sakuma Brothers:

> Certainly, examining one cultivated blueberry processor is not sufficient to render judgements [sic] as to the relative costs of processing cultivated vs. wild blueberries. This conclusion applies especially to Sakuma Brothers because their volume of processed blueberries is much lower than all but the smallest defendant processor, thus making it unlikely that they are able to exploit the available economies of size in processing. Moreover, Sakuma's processing operation includes a variety of fruit products, raising serious issues of how indirect costs were allocated among its various enterprises.

Sexton Report at 15.

8

For these three reasons, Dr. Solow concludes that "[b]ased on all of the presently available data and evidence, the significantly lower prices for unprocessed wild blueberries is evidence of a lack of competition among wild blueberry processors, the very absence of competition that would result from a conspiracy to fix the prices paid, allocate growers among processors, or otherwise agree to suppress competition among processors in the market for unprocessed wild blueberries." Id. at 13.

### b. Dr. Sexton

Dr. Sexton opines that, for the following reasons, "[t]he pattern of pricing behavior observed for Maine wild blueberries is not consistent with the allegation of price fixing and appears to be consistent with normal competition in a market of this type":

- due to the high perishability of the Maine wild blueberry, its price is determined in a localized geographic market that includes Maine and at least parts of Eastern Canada (EC). Cultivated blueberry prices are similarly determined in localized geographic markets in their respective production areas.
- Wild blueberries are a perennial crop. Supply of a perennial crop in any harvest period is determined by decisions made years previously, in terms of development of available acreage, and by weather conditions. Supply is unresponsive or inelastic to price.
- The market conditions for the procurement of raw blueberries in Maine and EC can be described as a loose oligopsony. . . .
- Under the aforementioned market conditions, the grower price will be determined by (i) the strength of demand . . . for the finished products, (ii) the size of the available wild blueberry harvest . . . (iii) the size of the harvest of cultivated blueberries, (iv) the magnitude of per-unit processing costs, (v) inventories of processed blueberry products carried forward from the previous year, and (vi) the relative bargaining power of growers and processors.
- Grower prices for wild blueberries cannot be compared directly with grower prices for cultivated blueberries because price in each case is determined in distinct geographic markets.
- Grower prices for cultivated blueberries used in processing will tend to be higher than grower prices for wild blueberries . . . because a substantial fresh market outlet exists for cultivated blueberries that does not exist for wild blueberries.

- An additional factor that adversely affects the farm price for wild blueberries relative to processed berries is the greater shrink that occurs for wild berries due to differences in harvest practices.
- The pattern of pricing behavior observed for Maine wild blueberries is not consistent with the allegation of price fixing and appears to be consistent with normal competition in a market of this type.

Expert Report of Richard Sexton, pp. 1-2 ("Sexton Report").

### i.     Agreement not to Solicit Growers

"Long-term relationships between a grower and a processor/handler as exist in Maine's blueberry industry are a common feature of agricultural markets. Both economic and cultural phenomena can explain the behavior quite independently of any explicit scheme to allocate market areas." Sexton Report at 10, ¶ 41. As Dr. Sexton explains:

> any processor's production capacity is limited. The processor will seek commitments for production from growers that enable the processor to efficiently utilize the capacity, both with respect to volumes delivered and timing of delivery. *** Small differences among growers as to timing of ripening of their crop can be important considerations to a processor in terms of insuring a balanced delivery of product over the harvest period. As noted, geographic location is also important. Processors will normally seek to acquire product grown in close proximity to their processing facilities. A processor who has arranged to receive production to efficiently manage his/her plant, both with respect to volume and timing, will not normally be in position to acquire additional production even if it is offered. In addition, the blueberry processors in Maine often take responsibility for doing the field work for many of their growers, especially the smaller ones. This fact puts an additional premium on securing grower patrons within a compact geographical area to economize on time spend [sic] transporting equipment and work crews between farm sites.

Id. at 10, ¶ 42. "From my experiences working with several agricultural industries, I have observed that producers often tend to be very loyal to their processor/handler and, thus, refrain from seeking alternative marketing opportunities. This loyalty may not be to the processor *per se*, but, rather, to an employee of the processor, such as a fieldman or delivery person. Processor/handlers in turn seek to foster stable, long-term relationships with growers and earn the reputation among growers of being a reliable handler who provides a secure 'home' for their production." Id. at 11, ¶ 43.

10

### ii. Similarity in Prices

Sexton states that Solow's statement that similarity in prices among the processors is evidence of price-fixing is wrong because "identical prices among buyers are also generated from other economic models of a market, including noncollusive oligopsony with undifferentiated products and perfect competition." Sexton Report at 10, ¶ 40. First, Sexton concludes that each processor employs a different pricing strategy, which is not consistent with a price-fixing arrangement. See id. at 13, ¶ 50.

Second, although Solow states that the field price for Maine wild blueberries is determined under a price leadership arrangement wherein prices are announced by Cherryfield, "[p]rice leadership is not uncommon in first-handler markets for agricultural products." Id. at 13, ¶ 51. "In my experience, it arises primarily when there is a dominant processor/handler in the industry." Id. "Because the dominant firm probably has the most information about market conditions, using a dominant firm's price as a basis for establishing its own price is probably an efficient way for smaller firms to establish price." Id.

### iii. Comparison with the Cultivated Blueberry Market

Sexton provides five explanations as to why "cultivated blueberries . . . do not substitute as inputs into the production of processed blueberry products," and why one cannot compare the wild and cultivated blueberry markets:

> [First,] first-handler markets for a commodity that is grown in multiple geographic areas may not be integrated in the sense that no transshipment of the raw commodity occurs between the different growing areas, and prices in the different geographic locations fluctuate somewhat independently. In other words, the farm price in these situations is determined by supply and demand conditions in each local growing region, and prices in different regions may vary considerably.

Sexton Report at 3, ¶ 7.

> [Second,] available supply at any given harvest period is determined primarily by (a) planting decisions made years ago, and (b) weather conditions during the growing season . . . . For commodities that are not readily storable in their unprocessed form due to perishability, these conditions imply collectively that the supply is essentially perfectly inelastic with respect to the market price, i.e., the supply is fixed without regard to the price received.

Id. at 3, ¶ 9.

11

[Third is the] seasonality in supply and/or demand. *** Growers who are able to time harvest to coincide with periods when demand is high relative to supply will receive a higher price than growers whose harvest comes on to the market when supply is large relative to demand. Seasonality is an important factor in explaining large regional differences in the grower price for cultivated blueberries.

Id. at 3, ¶ 10.

[Fourth, c]ultivated blueberry prices for processing are influenced to an important extent by the existence of the parallel fresh market for cultivated berries, which is not present to any important degree for wild berries.
[U]nder any form of competition the presence of a fresh market will raise the price of blueberries utilized in processing. The fact that cultivated blueberries have a fresh market outlet that is a premium market relative to the processing market is a key factor to understanding why the grower price of cultivated blueberries for processing uses often exceeds the grower price of wild blueberries.

Id. at 8, ¶ 34, and 9, ¶ 38.

[Fifth is the] differences in how shrink is handled in the two industries. Shrink is the difference in product volume at the farm and usable product volume received by the processor. Principal components of shrink are (i) materials other than actual product that become mixed with the product during the harvest process and (ii) spoilage. Because wild blueberries grow near to the ground and are often harvested with a hand raking technique, the harvest produces a relatively large volume of material other than berries. Perishability of the wild blueberry causes additional shrinkage due to spoilage incurred in transporting the product from field to processing facility. *** The shrink for cultivated blueberries used in processing is comparable to the shrink for wild blueberries when mechanical harvesting is used. However, most producers of cultivated berries operate sorting lines, including optical scanners, which remove most of the waste material. Cultivated blueberry growers are paid in most cases on tonnage that has been sorted and, thus, most waste material has been removed. Wild blueberry growers, conversely, are paid on the tonnage that leaves the field, i.e., tonnage that contains the shrink material.

Id. at 9, ¶ 39.

### 3. Procedural Posture

In February 2000, the plaintiffs filed this complaint, which has since been amended, alleging that the "[d]efendants and their co-conspirators have entered into and engaged in a continuing combination and conspiracy to suppress competition by artificially lowering, fixing, maintaining or stabilizing the prices of unprocessed wild blueberries." Second Amended Complaint ¶ 30. They further allege that "the

12

combination and conspiracy engaged in by defendants and their co-conspirators is an unreasonable restraint of the trade and commerce of this State in violation of 10 M.R.S.A. § 1101." Id. "In furtherance of their conspiracy, defendants and their co-conspirators engaged in a wide range of anti-competitive activities, the purpose and effect of which was to pay Class members artificially low prices for their wild blueberries. These activities included the following:

    a. defendants agreed among themselves to fix the prices they paid for wild blueberries at artificially low prices;

    b. defendants announced and paid artificially low prices for the Class's wild blueberries;

    c. defendants allocated growers among themselves by, among other things, agreeing not to solicit each other growers;

    d. defendants adopted the same basic pricing methods: setting and paying a field price without prior negotiation with any grower; waiting to pay the field price until after defendants had entered into contracts to re-sell most of the wild blueberries; and paying the same or similar field prices as each other;

    e. defendants collectively set the field price each year during meetings at the Holiday Inn in Ellsworth, Maine, or elsewhere;

    f. at least one defendant threatened to boycott any grower that sold or planned to sell wild blueberries to a processor in Canada."

Second Amended Complaint ¶ 31. "The unlawful combination or conspiracy has had the following effects, among others:

    a. price competition among defendants and their co-conspirators in the purchase of wild blueberries from growers has been artificially restrained;

    b. prices for wild blueberries paid to growers by the defendants and their co-conspirators have been fixed, lowered, maintained or stabilized at artificially low and non-competitive levels;

    c. growers of wild blueberries have been deprived of the benefit of free and open competition in the sale of wild blueberries."

Id. at ¶ 32. In December 2001, the defendants each moved for summary judgment.[12] The court heard oral argument on these motions on June 7, 2002.

---

[12] While Cherryfield, Wyman, and Allen each submitted their own motions for summary judgment, Merrill Blueberry Farms submitted a letter stating that it joined in the other three defendants' Motions for Summary Judgment.

## DISCUSSION

### A. Plaintiffs' Motion for Reconsideration

The court now addresses the plaintiffs' Motion for Reconsideration of this court's earlier decision regarding their Petition for Class Certification. The plaintiff responded to the court's decision denying certification by filing a Motion to Amend to Remedy the Defects in the court's decision. There is nothing improper with the plaintiffs' Motion to Amend to address the concerns set out in the court's earlier decision. This court allowed the plaintiff's Motion to Amend to add additional plaintiffs and granted the plaintiff's Motion for Reconsideration.

Upon reconsideration, the plaintiffs' Motion for Class Certification is hereby granted. The court finds that the plaintiffs did address the problems with the posture of their case by adding the additional plaintiffs. This court did not reconsider the other findings and conclusions of the court set out in the order dated January 24, 2001, except for the issue surrounding typicality. This court finds that the plaintiffs meet the legal requirements to be certified as a class action.

### B. Defendants' Motions for Summary Judgment

#### 1. Summary Judgment Standard in Antitrust Cases[13]

One of the bones of contention between the parties is the proper standard to apply for summary judgment motions in antitrust cases.

Procedurally, summary judgments are no different in antitrust cases than they are in other civil matters. 8 JULIAN VON KALINOWSKI, ANTITRUST AND TRADE REGULATION § 167.01 (2d ed. 2001) (hereinafter "KALINOWSKI"). See Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 468 (1992). In Maine, "[t]o survive a defendant's motion for summary judgment, a plaintiff must produce evidence that, if produced at trial, would be sufficient to resist a motion for a judgment as a matter of law. A plaintiff

---

[13] The plaintiffs' claims are brought pursuant to 10 M.R.S.A. § 1101, which states that "[e]very contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce in this State is declared to be illegal." There is no Law Court decision addressing summary judgment in these types of cases. The First Circuit has, however, held that the Maine antitrust statutes parallel the Sherman Act, and that those types of claims should be analyzed according to the doctrines developed in relation to federal law. Davric Maine Corp. v. Rancourt, 216 F.3d 143, 149 (1st Cir. 2000); Tri-State Rubbish, Inc. v. Waste Management, Inc., 998 F.2d 1073, 1081 (1st Cir. 1993). Moreover, the language used in the Maine statute is almost identical to the language used in the Sherman Act. The court will, therefore, use federal cases addressing the summary judgment standard in antitrust cases as a guide.

must establish a *prima facie* case for each element of the cause of action." <u>Stanton v. University of Maine System</u>, 2001 ME 96, ¶ 6, 773 A.2d 1045, 1048-1049 (citations and quotation omitted). As noted earlier, the plaintiffs bring this action pursuant to 10 M.R.S.A. § 1101, which provides that "[e]very contract, combination in the form of trusts or otherwise or conspiracy, in restraint of trade or commerce in this State is declared to be illegal."[14] Thus, in order to establish a *prima facie* case, the plaintiffs must show: (1) that the defendants entered into a contract, combination, or conspiracy, (2) which restrained trade or commerce in Maine, and (3) that they were injured thereby for each allegation. <u>See</u> 10 M.R.S.A. §§ 1101, 1104.

The main question is whether the plaintiffs have *prima facie* evidence which would allow them to overcome a motion for summary judgment. The plaintiffs may produce either direct evidence that the defendants engaged in such anti-competitive behavior, or circumstantial evidence from which a reasonable factfinder could conclude that the defendants engaged in such conduct. <u>See</u> <u>In re Citric Acid Litigation</u>, 191 F.3d 1090, 1093 (9th Cir. 1999).

"Direct evidence . . . must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." <u>In re Baby Food Antitrust</u>, 166 F.3d 112, 118 (3rd Cir. 1999). "[W]ith direct evidence the fact finder is not required to make inferences to establish facts." <u>Id.</u> (quotation and citation omitted). The plaintiffs in this case cannot rely on direct evidence to demonstrate a *prima facie* illegal restraint of trade case.

In the absence of direct evidence, the plaintiffs must present evidence from which the existence of an agreement or conspiracy can be inferred – *i.e.*, circumstantial evidence. <u>In re High Fructose Corn Syrup Antitrust Litigation</u>, 2002 WL 1315285, at *2 (7th Cir. June 18, 2002); <u>Petruzzi's IGA v. Darling-Delaware</u>, 998 F.2d 1224, 1230 (3rd Cir. 1993). "[I]n drawing [] inferences from underlying facts, a court must remember that often a fine line separates unlawful concerted action from legitimate business practices." <u>Petruzzi's</u>, 998 F.2d at 1230. Thus, "in antitrust cases, care must be taken to ensure that inferences of unlawful activity drawn from ambiguous evidence do not

---

[14] Section 1104 allows persons injured by conduct declared illegal under section 1101 to bring an action, such as this one, and collect damages. <u>See</u> 10 M.R.S.A. § 1104.

15

infringe upon the defendants' freedom." Id. (citation and quotation omitted). To understand exactly what inferences may be drawn from circumstantial evidence in an antitrust case up for summary judgment, it is necessary to look to the United States Supreme Court case of Matsushita Elec. Ind. Co. v. Zenith Radio, 475 U.S. 574 (1986).

Although in summary judgment motions "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." Matsushita, 475 U.S. at 587-588. Thus, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Id. at 588. "To survive a motion for summary judgment . . . a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility that the alleged conspirators acted independently.'" Id. at 588, *quoting* Monsanto Co. v. Spray-Rite Corp., 465 U.S. 752, 764 (1984). The plaintiff must show "that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [the plaintiff]." Id. (citation omitted). Moreover, "if the factual context renders [the plaintiffs'] claim implausible – if the claim is one that simply makes no economic sense – [the plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Id. at 586. "The Court's requirement in Matsushita that the plaintiffs' claims make economic sense did not introduce a special burden on the plaintiffs facing summary judgment in antitrust cases." Eastman Kodak Company v. Image Technical Services, Inc., 504 U.S. 451, 468 (1992). "Matsushita demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision." Id.

Most importantly, the court must keep in mind that "[t]he [Matsushita] Court warned that permitting the inference of conspiratorial behavior from evidence consistent with both lawful and unlawful conduct would deter pro-competitive conduct – an especially pernicious danger in light of the fact that the very purpose of the antitrust laws is to promote competition." In re Citric Acid Litigation, 191 F.3d 1090, 1095 (9th Cir. 1999).

16

Most "[f]ederal courts have interpreted Matsushita to require a two-part test for summary judgment.[15] Under this test, the court first determines if the plaintiff's evidence is 'ambiguous' – that is, if the evidence is of conduct that is 'as consistent with permissible competition as with illegal conspiracy.'" Alakayak v. British Columbia Packers, Ltd., 2002 WL 1150730, at *13 (Alaska May 31, 2002), quoting Matsushita. "If so, the plaintiff only avoids summary judgment if it submits some evidence that tend[s] to exclude the possibility that the defendants acted independently." Id. "[W]hen the plaintiffs' theory of conspiracy does rely entirely on circumstantial evidence, Matsushita requires that this evidence 'be evaluated in its factual context' to see if the summary judgment record as a whole provides a specific factual basis that, if accepted as true, would 'tend to exclude the possibility' that the alleged conspirators acted independently.'" Id., at * 13.

The court must apply this summary judgment framework "whenever the plaintiff cannot establish every element of its case without asking the court to draw an inference in his favor." In re Citric Acid Litigation, 191 F.3d 1090, 1095 (9th Cir. 1999).

## 2. Antitrust Law

"Every contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce in this State is declared to be illegal." 10 M.R.S.A. § 1101. Although the usual price-fixing situation is one in which *sellers* conspire to fix prices, *purchasers,* such as the processors in this case, may also violate 10 M.R.S.A. § 1101. Antitrust acts "appl[y] to abuse of market power on the buyer side – often taking the form of monopsony or oligopsony." Todd v. Exxon Corporation, 275 F.3d 191, 201 (2nd Cir. 2001). "The [Sherman] Act does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. The [Sherman] Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by

---

[15]  These courts include: Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 55 (2nd Cir. 1997); In re Baby Food Antitrust Litigation, 166 F.3d 112, 124 (3rd Cir. 1999); Laurel Sand & Gravel, Inc. v. CSX Transp., Inc., 924 F.2d 539, 543 (4th Cir. 1991); Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc., 200 F.3d 307, 312 (5th Cir. 2000); Super Sulky, Inc. v. U.S. Trotting Ass'n, 174 F.3d 733, 739 (6th Cir. 1999); Serfecz v. Jewel Food Stores, 67 F.3d 591, 599 (7th Cir. 1995); Blomkest Fertilizer v. Potash of Saskatchewan, 203 F.3d 1028, 1032 (8th Cir. 2000); In re Citric Acid Litigation, 191 F.3d 1090, 1094 (9th Cir. 1999); Gibson v. Greater Park City Co., 818 F.2d 722, 724 (10th Cir. 1987); Delong Equipment Co. v. Washington Mills Abrasive Co., 887 F.2d 1499, 1508 (11th Cir. 1989).

whomever they may be perpetrated." Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236 (1948) (dealing with oligopsony).

There are three elements the plaintiffs must demonstrate in order to defeat the defendants' motion for summary judgment: (1) the defendants entered into a contract, combination, or conspiracy, (2) that restrained trade or commerce, and (3) the plaintiffs were injured thereby.

### a. Price-Fixing Agreement

### i. Contract, Combination, or Conspiracy

One of the first issues is whether there is sufficient evidence demonstrating that the defendants actually formed an agreement to fix the prices paid to wild blueberry growers. The plaintiffs' price-fixing claim seems to be based on a theory of "conscious parallelism," which is described as "the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supra-competitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 227 (1993). "In other words, conscious parallelism is the practice of interdependent pricing in an [oligopsonist] market by competitor firms that realize that attempts to [increase] prices [paid for a product] usually reduce revenue without increasing any firm's market share, but that simple price leadership in such a market can readily increase all competitors' revenues." City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 570 (11th Cir. 1998).

In this case, the plaintiffs point out, and the evidence shows, that the processors' prices were roughly equivalent, and were in a tight range, during the alleged conspiracy. Moreover, the plaintiffs' expert has concluded that the "low prices Maine wild blueberry farmers receive for their berries (compared to unprocessed blueberry prices) demonstrates a lack of competition among the defendants." Plaintiffs' Opposing Brief, p. 26. "This establishes only that the producers consciously paralleled each other's prices." Blomkest Fertilizer v. Potash of Saskatchewan, 203 F.3d 1028, 1032 (8th Cir. 2000). However, "[e]vidence that a business consciously met the pricing of its competitors does not prove a violation of the antitrust laws." Id. at 1032-1033, citing Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540-41 (1954). "Particularly when the

product in question is fungible . . . courts have noted that parallel pricing lacks probative significance." Id. Thus, "[a]n agreement is properly inferred from conscious parallelism only when certain 'plus factors' exist." Id.

"A plus factor refers to the additional facts or factors required to be provided as a prerequisite to finding that parallel price action amounts to a conspiracy," id., and "are necessary conditions for the conspiracy inference." In re Baby Food Antitrust, 166 F.3d 112, 122 (3rd Cir. 1999). "The requirement of 'plus factors' is necessary because consciously parallel behavior alone leaves the circumstantial evidence of collusion in equipoise; consciously parallel behavior by oligopolists does not itself support an inference of agreement, or 'a meeting of the minds,' any more strongly than it supports an inference of legal price maintenance or leadership. Thus, this requirement ensures that unilateral or procompetitive conduct is not punished or deterred." City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 571 (11th Cir. 1998).

"*A plaintiff has the burden* to present evidence of consciously paralleled pricing *supplemented with* one or more plus factors." Blomkest, 203 F.3d at 1033 (emphasis supplied). "The mere existence of plus factors, however, is not necessarily sufficient for the plaintiff to survive summary judgment. For a case to reach the jury, the plus factors evidence must tend to exclude the possibility of independent action." Merck-Medco Managed Care, Inc. v. Rite Aid Corp., 22 F.Supp.2d 447, 469 (D.Md. 1998).

The plus factors may include evidence demonstrating that the defendants: (1) acted contrary to their economic interests, (2) were motivated to enter into a price-fixing conspiracy, In re Baby Food, 166 F.3d at 122; Petruzzi's, 998 F.2d at 1242, (3) exchange of price information and opportunity to meet, and (4) a large number of inter-defendant communications, Todd, 275 F.3d at 198, Wallace v. Bank of Bartlett, 55 F.3d 1166, 1168 (6th Cir. 1995).

### (a) Defendants Acted Contrary to their Economic Interests

"One prominent 'plus factor,' to which antitrust plaintiffs often take recourse, is a showing that the defendants' behavior would not be reasonable or explicable (*i.e.*, not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade – that is, that the defendants would not have acted as they did had they not been conspiring in restraint of trade." City of Tuscaloosa, 158 F.3d at 572.

19

"However, where there is an independent business justification for the defendants's [sic] behavior, no inference of conspiracy can be drawn." Blomkest, 203 F.3d at 1037.

The plaintiffs submit that they have met this "plus factor." First, they assert that despite the defendants' general desire to expand their businesses, they admit they do not solicit each other's growers. Secondly, none of the defendants raise their prices in order to lure growers to their facilities.

The defendants state that their actions are explained by legitimate business reasons. Wyman's Brief, p. 18.

> Of the blueberries Wyman's does not grow itself, it purchases most of these berries from large growers and growers' cooperatives, taking advantage of the administrative ease of dealing with fewer entities, and benefiting from the economies of scale. By dealing primarily with large growers and cooperatives, Wyman's receives a substantial volume of berries, gains more control over deliveries, eases administrative burden, etc., for all of which it pays a premium. If other processors raise the prices paid to their growers, Wyman's raises its prices, in order to retain its growers. Wyman's negotiates individually with each grower or cooperative, adjusting the prices it pays growers in response to the size and quality of the crop that year, the amount of inventory left over from previous years, the market for processed fruit, and the nature of the relationship Wyman's has with each grower.
>
> Moreover, the evidence indicates that Wyman's actions are inconsistent with the Plaintiffs' conspiracy theory, because Wyman's would not benefit if the conspiracy alleged by Plaintiffs actually existed. Wyman's negotiates contracts with cooperatives that base payment on the field price plus a set amount, with a guaranteed floor. These contracts are typically for a term of two or three years. Because the field price plus the set amount must exceed the floor amount, Wyman's may be obligated under these contracts to pay a substantially higher amount than the price paid by other processors. *** For example, under Wyman's contract with Pleasant River Co-op, it is obligated to pay its field price plus 10¢, with a guaranteed minimum of 45¢. A field price that drops to 25¢, accordingly, would obligate Wyman's to pay 45¢ while its competitors paid only 25¢, a 80% premium over the field price. A grower payment of 80% above the field price could hardly reflect an agreement to fix prices.

Wyman's Brief, pp. 18-19. Cherryfield states that the processors do bid against each other for crops of growers who bargain collectively.

"It is quite likely that [oligopsonists] acting independently might [buy] at the same . . . price as their competitors because the firms are interdependent and competitors would match any [higher] price . . . . Therefore, they quickly learn that [paying higher] price[s] . . do[es] not increase market share and go back to their noncompetitive pricing."

20

Petruzzi's IGA v. Darling-Delaware, 998 F.2d 1224, 1244 (3rd Cir. 1993). "It is[, however,] one thing for competitors all to charge the same price, as a perfectly competitive market could lead them to do so. It is quite another for competitors all to refrain from soliciting each other's accounts." Petruzzi's, 998 F.2d at 1246. See Areeda, *Antitrust Law* ¶ 1420d, at 123-124 (noting that refusal to bid in an oligopoly situation is not inevitable, but cannot be sustained without some enforcement mechanism).

### (b) Motivation to Enter into a Price-Fixing Conspiracy

The plaintiffs assert several items in support of this "plus factor." First, Cherryfield's and Wyman's CEOs viewed cooperation among the wild blueberry processors as crucial to their ability to successfully compete against processors of other fruits. Second, the plaintiffs submitted a note from Flanagan (of Wyman's) in May 1998 to Bragg (of Cherryfield) stating that Wyman "enjoys competing against" Cherryfield "on our terms, not on the terms of people who see their interests served by pitting us against one another." Plaintiffs' Opp. p. 9. Third, the head of Cherryfield believed that the wild blueberry industry could successfully compete against other fruits only if the wild blueberry processors and other market participants worked together. Plaintiffs' Opp. p. 9.

### (c) Exchange of Price Information and Opportunity to Meet

The plaintiffs assert several facts in support of this "plus factor." First, several defendants' decision-making employees testified that two of the defendants, Allen and Merrill, have met annually to discuss the field price of wild blueberries; Allen and Merrill jointly own Coastal Blueberries. Second, three of the four defendants, Cherryfield, Allen, and Wyman, traveled throughout Europe together annually, as members of the North American Blueberry Export Council ("NABEC"), to jointly negotiate the price at which they would sell their processed blueberries to overseas corporations. The plaintiffs argue that this provided ample opportunity to discuss field prices. Third, testimony that Wyman's CEO asked one owner of Merrill why another owner of Merrill "would ever pay more for the blueberry crop than other processors." Plaintiffs' Opp. p. 6-7. "This extraordinary testimony is susceptible of almost no reasonable explanation except that Wyman's perceived Merrill as breaching a pricing agreement among the defendants." Plaintiffs' Opposing Brief, p. 22. In other words, Wyman's was "polic[ing] the

21

conspiracy." Plaintiffs' Opposing Brief, p. 23. Fourth, there were communications about prices in other circumstances as well – Bragg of Cherryfield sent Flanagan of Wyman a note advising Flanagan not to drive down the price of processed wild blueberries in Europe by quoting a lower price than Cherryfield. Cherryfield's effort to convince its competitor not to compete on price is consistent with Cherryfield's participation in an agreement with Wyman's and the other defendants to fix the field price.

The defendants counter those assertions by stating: first, "[t]he plaintiffs lack any evidence that the Defendants ever discussed or otherwise communicated with each other the prices to be paid to growers." Wyman's Brief, p. 16. Second, "[t]here is no evidence that the processors exchanged pricing information in advance with each other," and "[t]here is no evidence that Defendants discussed with each other any decisions to match each other's field prices." Id. at pp. 16-17; Allen's Brief, pp. 18-19.

"[C]ourts generally reject conspiracy claims that seek to infer an agreement from communications despite a lack of independent evidence tending to show an agreement and in the face of uncontradicted testimony that only informational exchanges took place." In re Baby Food Antitrust, 166 F.3d 112, 133 (3rd Cir. 1999) (citation and quotation omitted). "[E]vidence of social contacts and telephone calls among representatives of the defendants was insufficient to exclude the possibility that the defendants acted independently. *** [S]uch evidence of 'opportunity' should be accorded little, if any, weight. Company personnel do not often operate in a vacuum or 'plastic bubble'; they sometimes engage in the longstanding tradition of social discourse." Id.

"Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange." Mitchael v. Intracorp, Inc., 179 F.3d 847, 859 (10th Cir. 1999). In this case, there is additional information. There were two incidents where one defendant questioned why another defendant quoted a higher price for blueberries.

### (d) Large Number of Inter-defendant Communications

"Courts have held that a high level of communications among competitors can constitute a plus factor which when combined with parallel behavior, supports an

inference of conspiracy." Blomkest, 203 F.3d at 1033 (plaintiffs' evidence of communications, including meetings at trade shows and conventions, price verification calls, and discussions regarding foreign export association, bore no relationship to price increases in question). But, "there must be evidence that the exchanges of information had an impact on pricing decisions." Id. at 1034.

The plaintiffs assert that the following support this plus factor. Wyman's president specifically instructed an employee to complain to Merrill that Merrill's price to growers was too high. Specifically, Wyman's CEO instructed the employee to tell Richard Merrill, an officer and part owner of Merrill, that Wyman's was "tear ass" at Merrill for paying more than the other defendants for wild blueberries. Plaintiffs' Opp. p. 6. Also, there is testimony that Wyman's CEO asked one owner of Merrill why another owner "would ever pay more for the blueberry crop than other processors." Plaintiffs' Opp. p. 6-7.

### ii.    Restraint of Trade

The next question is whether the defendants' alleged price fixing agreement restrained trade. Section 1 cases are divided into types: "per se" and "rule of reason." In re Baby Food Antitrust Litigation, 166 F.3d 112, 117-118 (3rd Cir. 1999). "A per se offense is defined as an agreement in which the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." 1 KALINOWSKI, § 12.02 [1]. In "per se" cases, the standard "presumes that the questionable conduct has anticompetitive effects without comprehensive inquiry into whether the concerted action produced adverse, anticompetitive effects." In re Baby Food, 166 F.3d at 118.

"Rule of reason" cases use "a case-by-case method that involves consideration of all of the circumstances of a case to decide whether certain concerted action should be prohibited because it amounts to an anti-competitive practice. The analysis to be applied depends on the essence of concerted action in dispute." Id.

The plaintiffs' allegation of a price-fixing agreement is a "per se" offense. See 1 KALINOWSKI § 12.02 [2][a] (Price-fixing between competitors (horizontal price-fixing) is a per se antitrust violation); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940) ("Under the Sherman Act a combination formed for the purpose and with the

effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal per se."); L. Ray Packing Co. v. Commercial Union Ins., 469 A.2d 832, 834 (Me. 1983).

### b. Agreement not to Solicit Each Others' Growers

#### i. Contract, Combination, or Conspiracy

The first question is whether the plaintiffs have submitted sufficient evidence to demonstrate the existence of an agreement among and between the defendants not to solicit each other's growers. "Allocation of markets in violation of antitrust laws typically involves an agreement not to compete for customers, not to sell in the same geographic area, or not to sell a similar product." Deloach v. Philip Morris Companies, Inc., 2001 WL 130221, at * 8, n. 12 (M.D.N.C.).

The plaintiffs submit several facts in support of their allegation that the defendants had a market allocation agreement. First is the testimony of Ragnar Kamp, Cherryfield's Operations Manager. In his deposition, he stated that he was "criticized by Allen's, a supposed competitor, for trying to lure away one of Allen's customers."[16] Plaintiffs' Opposing Brief, p. 23. According to the plaintiffs, this testimony "is susceptible of almost no interpretation other than that there was an agreement among the defendants not to solicit each other's growers. Id.

Second, at one time there was a document that described Allen's efforts to assure itself that Cherryfield had not begun soliciting Allen's growers. Neither Allen nor Cherryfield, however, has been able to locate this correspondence.

---

[16] He specifically stated at the deposition:

> Q: Was it your perception that [Mr. Roy Allen of Allen's Blueberry Freezer] felt as though you shouldn't go after his grower?
> A: Well, I guess he feels we shouldn't go after his growers, yes, and I wanted to make him understand that we don't actively go after growers.
> Q: Did he seem angry when you talked to him?
> A: After – when he finished up and he understood that we had not, he was okay with it, I guess.
> Q: Did you have any concerns about anything that Roy Allen would do as a result of his mistaken belief that you had solicited one of his growers?
> A: Not in particular, but I mean he could have tried to actively go out and solicit every grower we had and it would just create unrest and – I don't know – a lot more phone calls, I would imagine. I don't know. It's more a matter of I didn't like what I was being accused of, I guess."

24

Third, the defendants have admitted that they do not solicit each other's growers. According to the plaintiffs, "the admissions of the defendants and their expert that they do not solicit each other's growers despite the need for a steady supply of blueberries and unused processing capacity, is more than sufficient for a jury to find that the defendants had an agreement not to solicit each other's growers." Plaintiffs' Opposing Brief, pp. 23-24.

Fourth, defendants have provided no documents showing solicitation of another processor's growers. As Cherryfield puts it: "in order to be successful, processors must be assured of sufficient supply, either by producing berries from their own land or purchasing them from others." Given this fact, however, there is evidence demonstrating that none of the defendants attempted to solicit other processors' growers. Ironically, the evidence also indicates that at least some of the processors were not operating at capacity during the damages period, and thus could have processed more berries.

Fifth, although the larger processors paid more, not too many growers switched. In 1997 and 1998, the smaller defendant processors, Allen's and Merrill, paid a slightly lower field price than the larger defendant processors, Cherryfield and Wyman's. According to the plaintiffs, this had no effect on their number of purchases.

The defendants counter with several assertions. First, Mr. Kamp did not say in his deposition that there was an agreement to allocate market share among the defendants, he said that it is not Cherryfield's practice to engage in solicitation. As he explained, "we try to let our good service and so and so forth get growers to come to us." Cherryfield Brief, p. 17. Moreover, the defendants' allege that the plaintiffs "have acknowledged that they are free to sell whatever berries come from their land to whomever they choose." Allen's Brief, p. 21.

"It is quite likely that [oligopsonists] acting independently might [buy] at the same . . . price as their competitors because the firms are interdependent and competitors would match any [higher] price . . . . Therefore, they quickly learn that [paying higher] price[s] . . do[es] not increase market share and go back to their noncompetitive pricing." Petruzzi's IGA v. Darling-Delaware, 998 F.2d 1224, 1244 (3rd Cir. 1993). "It is[, however,] one thing for competitors all to charge the same price, as a perfectly competitive market could lead them to do so. It is quite another for competitors all to

refrain from soliciting each other's accounts." Petruzzi's, 998 F.2d at 1246. See Areeda, *Antitrust Law* ¶ 1420d, at 123-124 (noting that refusal to bid in an oligopoly situation is not inevitable, but cannot be sustained without some enforcement mechanism).

### ii. Restraint of Trade

An allegation of market allocation is a per se offense. See 1 KALINOWSKI § 14.02 ("Horizontal market divisions are generally treated as per se offenses." Courts "have consistently held horizontal market divisions to be per se unlawful . . . ."); U.S. v. Topco Associates, Inc., 405 U.S. 596, 608 (1972) ("One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. *** This court has reiterated time and time again that horizontal territorial limitations are naked restraints of trade with no purpose except stifling of competition).

### 3. Conclusion

The ultimate question here is whether there is enough evidence, considered as a whole, for a reasonable jury to find that the defendants and the co-conspirators have entered into and engaged in a continuing combination of conspiracy to suppress competition by artificially lowering, fixing, maintaining or stabilizing the prices of unprocessed wild blueberries or engaged in an unreasonable restraint of trade and commerce of this state in violation of 10 M.R.S.A. § 1101.

The court must therefore ask what inferences are to be drawn from the individual pieces of evidence and from the evidence as a whole, including the statistical evidence from the competing experts. In construing the evidence favorable to the plaintiff, the court holds that there is sufficient evidence to support the plaintiff's contentions preventing the granting of the defendants' motions for summary judgment. This is so even applying the defendants' arguments that Maine law requires "plus factors." The court denies the defendants' motion for summary judgment applying their requested view of the standard for summary judgment in these types of cases.

THE DOCKET ENTRY IS:

The plaintiffs' Motion for Reconsideration for Class Certification is ALLOWED.
The defendants' Motion for Summary Judgment is DENIED.

Justice, Superior Court

DATED: July 2/, 2002

Date Filed __2/28/00__     Knox     Docket No. __CV-00-015__

County

Action __Other Statutory Actions__

Anti Trust - Class Action

~~JUSTICE MARSANO SPECIALLY~~
~~ASSIGNED ON 8/23/00~~ Recused 6/18/01

**JUSTICE JABAR SPECIALLY
ASSIGNED ON 11/21/01.**

NATHAN PEASE, JR., ALAN S.JOHNSON,
CARL CUNNINGHAM, JR., and THOMAS
WORCHESTER, On Behalf of Themselves
and All Others Similarly
Situated,       ...ED

vs.

JASPER WYMAN & SON;
MERRILL BLUEBERRY FARMS, INC.;
ALLEN'S BLUEBERRY FREEZER, INC.,;
and CHERRYFIELD FOODS, INC.,

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| William D. Robitzek, Esq.<br>PO Box 961<br>Lewiston ME 04243-0961<br>784-3576 | ~~Daniel A. Pileggi, Esq.~~ (Merrill Blueberry<br>~~Philip K. Clarke, Esq.~~   Farms, Inc.,)<br>PO Box 917    **(W/D 1/30/01)**<br>Bangor ME 04402-0917    942-4644<br>Jerrol A. Crouter, Esq. (Cherryfield Foods)<br>PO Box 9781<br>Portland ME 04104-5081    772-1941<br>James T. Kilbreth, Esq. (Jasper Wyman&Sons)<br>PO Box 586<br>Portland, ME 04112-0568    774-4000 |

=================================================
### DEFENDANT'S ATTORNEYS
Melissa A. Hewey, Esq. (Cherryfield Foods)
    PO Box 9781
    Portland ME 04104    772-1941
Daniel A. Pileggi, Esq.
PO Box 723 (Merrill Blueberry)
Ellsworth,ME 04605   667-7121

Michael M McAleer, Esq. (Allen's Blueberry
PO Box 1401        Freezer)
Bangor ME 04402-1401    947-4501
~~Philip D. Buckley, Esq.~~ (Same Address)

| Date of Entry | |
|---|---|
| 2/29/00 | On 2/28/00, Complaint C... ...ry Sheet filed. |
| | **PLAINTIFF'S ATTORNEY**<br>~~Michael D. Hausfeld, Esq.~~ |
| 2/29/00 | ~~Daniel A. Small, Esq.~~    ...ttorney Robitzek. |
| | ~~Charles E. Tompkins, Esq.~~ |
| 3/15/00 | ~~Leslie C. Esposito, Esq.~~   ...es filed:<br>  1100 New York Ave, N.W.   ...ved through Michael Hill, Esq. on 3/8/00; and<br>  West Tower, Suite 500   ...hrough John Duncan on 3/9/00.<br>  Washington DC 20005-3965<br>  202-408-4600 |
| 3/16/00 | ~~Coleman R. Rosenfield, Esq.~~ ...e on Summons filed:<br>  HC 33 Box 404 R. (Pro Hac   ...., served through Eugene Merrill on 3/8/00.<br>  Spruce Head ME 04859   Vice)<br>  594-2121 |
| 3/20/00 | On 3/17/00, Return of Service on Summons filed:<br>-Allen's Blueberry Freezer, Inc., served through Roy P. Allen, II on 3/13/00. |
| 3/27/00 | Answer and Affirmative Defenses filed by Attorneys Pileggi and Clarke on behalf of Merrill Blueberry Farms, Inc. |
| 3/28/00 | Answer of Defendant Cherryfield Foods, Inc. filed by Attorney Crouter. |
| 3/29/00 | Answer of Defendant Jasper Wyman & Son filed by Attorney Kilbreth. |
| 3/29/00 | Amended Answer and Affirmative Defenses filed by Attorneys Pileggi and Clark. |
| 4/5/00 | On 4/4/00, Answer and Affirmative Defenses of Defendant, Allen's Blueberry Freezer, Inc., filed by Attorney McAleer. |
| 4/6/00 | Scheduling Order filed:<br>Discovery Deadline is December 6, 2000.<br>Dated: 4/6/00<br>Studstrup, J<br>Copy mailed to Attorneys Robitzek, Pileggi, Clarke, Crouter, Kilbreth and McAleer. |